UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAMELA WALLACE,

                              Plaintiff,

        – against –

GROUP LONG TERM DISABILITY PLAN
FOR EMPLOYEES OF TDAMERITRADE
HOLDING CORPORATION and THE
HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

                              Defendants.

**OPINION & ORDER**

19 Civ. 10574 (ER)

Ramos, D.J.:

        Pamela Wallace brings this action against Defendants Group Long Term Disability Plan

For Employees of TDAmeritrade Holding Corporation ("TDAmeritrade") and The Hartford Life

and Accident Insurance Company ("Hartford"), appealing Hartford's decision to deny her claim

for long-term disability ("LTD") benefits, pursuant to the Employee Retirement and Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Before the Court are the parties'

cross-motions for summary judgment, Docs. 26 and 27.  For the following reasons, Defendants'

motion is GRANTED and Wallace's motion is DENIED.

I.        **BACKGROUND**[1]

        A.        **The Long-Term Disability Plan**

        Wallace seeks LTD benefits allegedly owed to her under a long-term disability plan (the

"Plan") maintained by her former employer TD Ameritrade.  Doc. 29, Defs' Counter 56.1 ¶¶ 1–

---

[1] All facts in this section are taken from the parties' Rule 56.1 statements and documents in the Administrative
Record, which has been filed under seal.  When citing directly to the Administrative Record, the Court uses the
Bates numbers utilized by the parties:  All citations to the Plan itself are referred to as "POL _" and citations to the
rest of the Administrative Record are referred to as "HL _."

2.  Hartford issued a group policy of insurance to fund benefits under the Plan, and was also the claim administrator for the Plan.  *Id.* ¶¶ 3,6.  Wallace was a participant in the Plan.  *Id.* ¶ 5.

As relevant here, the Plan defines one who is "disabled" or has a "disability" as one who is "prevented from performing one or more of the Essential Duties of

1.      Your Occupation during the Elimination Period;

2.      Your Occupation, for the 24 month(s) following the Elimination Period, and as a result [y]our Current Monthly Earnings are less than 80% of Your Indexed Predisability Earnings; and

3.      after that, Any Occupation."

*Id.* ¶ 12.

The Plan defines an "Essential Duty" as a duty that:

1.      is substantial, not incidental;

2.      is fundamental or inherent to the occupation; and

3.      cannot be reasonably omitted or changed.

*Id.* ¶ 13.

It continues that "[y]our ability to work the number of hours in [y]our regularly scheduled work week is an Essential Duty."  *Id.*  It defines "Full-time Employment" as "at least 30 hours weekly."  POL 8.

Finally, the Plan provides that "Any Occupation" is  "…any occupation for which [y]ou are qualified by education, training or experience, and that [meets certain earning threshold requirements]."  Doc. 29  ¶ 14.

The Plan provides that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  *Id.* ¶ 16.

### B.  Wallace's Departure from TD Ameritrade and Fibromyalgia Diagnosis

Wallace last actively worked for TD Ameritrade in February 2010, when she suffered a toe fracture and other foot injuries that limited her ability to walk and stand.  Doc. 30-3, Pl's. Counter 56.1 ¶ 5.  After providing her with short-term benefits, Hartford awarded her LTD benefits on September 22, 2010 based on her foot injuries.  *Id.* ¶¶ 5–6, HL 146–48, 161. Hartford stated these benefits were effective as of August 5, 2010.  Doc. 30-3 ¶ 6; HL 146–48. However, Wallace and Hartford were in communication throughout fall and winter 2010 regarding updates about her condition.  *See generally* Doc. 29 ¶¶ 99–191.  In August 2011, Wallace's foot surgeon, Dr. Christopher Hubbard, stated that she could return to work with no restrictions.  Doc. 30-3 ¶ 7.[2]

Throughout 2010 and 2011, Wallace also saw several physicians in connection with other medical complications relevant to this case.  These included Dr. Steven Meed, a rheumatologist who first who diagnosed her with fibromyalgia, a chronic pain and fatigue disorder.  Doc. 29 ¶ 178.  She also saw a psychiatrist, Dr. Laura Sherman, who treated her for Obsessive Compulsive Disorder ("OCD").  *Id.* ¶ 129.[3]  Under the Plan, Wallace was required to show that she was unable to perform job duties under "Any Occupation" after August 5, 2012 to continue receiving benefits beyond that date.  HL 91.

### C.  Wallace's 2012 Benefit Denial and Appeal

Wallace continued to receive treatment and evaluation for her fibromyalgia between August 2010 and 2012, which provided the basis for her claim for continuing LTD benefits after

---

[2] Hartford's records also indicate that, on June 22, 2011, Hartford reviewed a record from Dr. Hubbard stating that Wallace was restricted to sitting for eight hours per day and standing or walking for one hour per day.  Doc. 29 ¶ 149, HL 339.

[3] Dr. Sherman first diagnosed her with OCD in May 2006.  ¶ 412.

August 5, 2012.  This benefits claim also included evidence of her OCD.  For example, she submitted an Attending Physician Statement ("APS") from Dr. Sherman dated February 4, 2011, informing Hartford of her OCD diagnosis.  Doc. 29 ¶¶ 129–30.  Dr. Sherman opined that Wallace "[c]onstantly washes hands and can't travel" and that her "[c]ontamination fears and rituals became disabling."  *Id.* ¶¶ 131, 133.

Wallace's application for continuing benefits was eventually denied by Hartford and, after an unsuccessful administrative appeal, Wallace appealed these determinations to this District.  On March 26, 2015, the Honorable Lorna Schofield issued an opinion upholding Hartford's denial of benefits (and denial of her administrative appeal therefrom) on the basis of fibromyalgia, but remanding to Hartford for further consideration regarding Wallace's OCD. *See Wallace v. Grp. Long Term Disability Plan for Empls. of TDAmeritrade Holding Corp.*, No. 13 Civ. 6759 (LGS), 2015 WL 1402221 (S.D.N.Y. Mar. 26, 2015) ("*Wallace I*").  This opinion is described in more detail in Section I.D., *infra*.  However, a brief summary of the underlying application and appeal follows here.

On July 21, 2010, Hartford first reviewed an APS from Dr. Meed dated July 10, 2010, stating that Ms. Wallace's primary diagnosis was fibromyalgia and secondary diagnosis was uncharacterized connective tissue disorder ("UCTD").[4]  Doc. 29 ¶ 42.  Dr. Meed noted that, as a result of these conditions, she reported muscle fatigue, aching, sleep disturbance, and diffuse trigger point tenderness.  *Id.* ¶¶ 43–44.  On August 2, 2010, after Hartford sought clarification of his opinion, Dr. Meed indicated that Wallace could not work at a full-time sedentary or light physical demand job due to these symptoms.  *Id.* ¶ 49.  Over roughly the next year, Dr. Meed would submit to Hartford several more APSs in which he stated that Wallace's fibromyalgia and

---

[4] Dr. Meed later stated that there was limited evidence for the UCTD diagnosis.  ¶ 128.  Other physicians also later opined that there was no evidence of UCTD.  *See, e.g.*, ¶ 337.

related symptoms rendered her unable to work.  *See, e.g.*, *id.* ¶¶ 109, 178.  These included an

August 23, 2011 APS confirming her positive trigger points, and stating that she was restricted

from standing, walking and sitting for any amount of time.  *Id.* ¶¶ 180–81.

This August 23 APS became the source of some disagreement.  Hartford later received

Dr. Meed's office visit note for this date, in which he stated that Wallace had reported dramatic

improvement in her symptoms related to fibromyalgia, including fatigue, since making certain

adjustments to her medicine regime.  *Id.* ¶ 190.  Hartford's claim investigator, Heather Reiss,

later interviewed Dr. Meed on October 11, 2011 to ask him about perceived discrepancies

between these visit notes and his APS from the same day.  HL 3273.  Reiss's notes indicate that

Dr. Meed confirmed that she had showed improvement that day.  *Id.*  They further state that,

when asked about the restrictions proposed in his APS reports, he replied that he was not paid to

be an objective third party.  *Id.*

Hartford also sought the opinions of other physicians during this time period.  In a report

dated September 8, 2010, Dr. Ara Dikranian, an independent consulting physician, reviewed

Wallace's medical records and acknowledged that she had fibromyalgia.  Doc. 29 ¶ 71, HL 2839.

However, Dr. Dikranian opined that, from the period of February 4, 2010 through the date of his

report, Wallace was capable of "sitting continuously for up to eight hours per day, walking and

standing (combined) for 15 minutes at a time for a total of one hour per day, and lifting/carrying

no more than 10 lbs. occasionally."  Doc. 29 ¶ 74.

Similarly, on April 18, 2012, Wallace had an independent medical evaluation with Dr.

Geoffrey Gladstein, another consulting physician.  *Id.* ¶¶ 318–19.  Dr. Gladstein's evaluation has

also become the source of some disagreement.  Several days after his examination, but before his

report was received by Hartford, Reiss visited Dr. Gladstein's office to show him surveillance

footage that had been conducted of Wallace on several dates in August and September 2011 and April 2012. *Id.* ¶¶ 330–31. These surveillance videos showed Wallace "entering and exiting [her] vehicle, on several occasions, as the driver, without any apparent difficulty," "driving for an extended period of time without stopping," and "lifting/carrying items of unknown weight and bending at the waist several times." HL 68. The record also indicates that during this visit, Reiss provided Gladstein with additional information about the procedural history of Wallace's claim, as well as her efforts to open a spa business in Connecticut. Doc. 29 ¶ 331. As Judge Schofield noted in *Wallace I*, some of the information provided by Reiss to Dr. Gladstein was misleading. For example, Reiss misrepresented the point at which Wallace first claimed she was suffering from UCTD, and Reiss' information about Wallace's efforts to open a spa business was not relevant to Dr. Gladstein's examination. 2015 WL 1402221, at *17–18.

After the visit and viewing the footage, Hartford was informed that Dr. Gladstein contacted Medical Consultants Network, the vendor through which he had been retained, to tell it that he had changed his conclusion section. Doc. 29 ¶ 334. Dr. Gladstein's final report ultimately recognized that Wallace suffered from fibromyalgia as well as chronic pain and a sleep disorder, and identified "some areas of tenderness" in her trigger point examination. *Id.* ¶ 336. However, he found that Wallace was "in no acute distress," had normal muscle strength, and "did not appear to have any specific functional limitations that were not related to her complaints of severe fatigue." *Id.* ¶¶ 336, 338, 341. Based on this, Dr. Gladstein found that Wallace was able to sit for eight hours per day with frequent breaks, stand for 10–15 minutes each hour, and walk for 30–60 minutes in an eight hour day. *Id.* ¶¶ 347–49. Ultimately, he determined, she could work full-time in a sedentary occupation. *Id.* ¶ 346.

On July 19, 2012, Hartford denied the claim for continuing LTD benefits as of August 5, 2012.  HL 72.  In its determination, Hartford considered several sources of evidence, including the surveillance videos recorded between August 2011 and April 2012.  HL 68.  Hartford also relied on Dr. Gladstein's report and recommendations.  *Id.* at 69.

On August 12, 2012, Wallace indicated she wished to appeal the determination.  Doc. 29 ¶ 388.  Hartford received her supplemental appeal letter, submitted after Wallace retained counsel, on February 22, 2013.  *Id.* ¶ 397.  In this letter, Wallace argued that Hartford's denial was arbitrary and capricious on several grounds, including that it improperly relied on the surveillance videos and improperly discounted her subjective symptoms of fibromyalgia.  *Id.* ¶¶ 402–3.  In support Wallace submitted additional evidence, including letters from Dr. Meed and Dr. Sherman.  *Id.* ¶¶ 407, 412.

Hartford referred her appeal to an independent medical record peer review vendor, which hired two new independent physicians to review her records.  *Id.* ¶ 440.  The first of these reports was conducted by Dr. Julia Ash, a rheumatologist.  Dr. Ash acknowledged Wallace's fibromyalgia diagnosis, but found that her self-reported disabling fatigue was not supported by the video surveillance.  *Id.* ¶ 453.[5]  Dr. Ash ultimately concluded that Ms. Wallace was functionally able to work an eight-hour day, with some restrictions and limitations, including five-minute breaks every two hours.  *Id.* ¶ 458.

Dr. Melvyn Lurie, a psychiatrist, also reviewed her records.  *Id.* ¶ 462.  He stated that Wallace's medical records demonstrated that she had reported symptoms to Dr. Sherman that were consistent with the diagnosis of OCD.  *Id.* ¶ 467.  However, based on the surveillance videos and Dr. Lurie's review of the record, including Dr. Sherman's notes, he opined that he

---

[5] Dr. Ash also stated that there was no evidence that Wallace suffered from UTCD, which had also been a ground for Wallace's claim.  *See, e.g.*, *id.* ¶ 103.

could not identify any restrictions or limitations from a psychiatric perspective, because there was no consistent, credible evidence for any psychiatric restrictions or limitations. *Id.* ¶ 483. For example, Dr. Lurie stated that Wallace's cleaning of her car was "not vigorous" enough to support a diagnosis of debilitating OCD. *Id.* ¶ 476.

On March 29, 2013, Hartford upheld its initial adverse benefit determination on appeal. *Id.* ¶ 484. Hartford stated that its determination had been supported by substantial evidence, including the medical statements of her providers, the report of Dr. Gladstein, and other evidence in the record. *Id.* ¶ 486. It also referenced the reports of Dr. Ash and Dr. Lurie. *Id.* ¶ 489. Hartford found that Dr. Ash's report supported the conclusion that, despite the fibromyalgia diagnosis, Wallace had no "physical limitation to prevent at least a sedentary full time work" and could work an eight hour day, subject to the restrictions laid out in Dr. Ash's report. HL 55–56. Hartford also credited Dr. Lurie's conclusions about Wallace's OCD. *Id.* 56–58.

### D.   The Wallace I Decision and Remand

On September 20, 2013, Wallace filed suit in the Southern District of New York, challenging the denial of LTD benefits on and after August 5, 2012 ("*Wallace I*"). *Id.* ¶ 497. Following cross-motions for summary judgment, Judge Schofield found that Hartford's reliance on the opinions of Dr. Ash and Dr. Gladstein was not arbitrary or capricious, but that its reliance on Dr. Lurie's report was not supported by substantial evidence. *Id.* ¶ 500. Judge Schofield remanded the case to Hartford to conduct a "full and fair review," limited to evaluating whether Wallace's OCD entitled her to benefits. *Id.*[6] In her decision, Judge Schofield found that Dr. Meed's conclusion that Wallace could not sit or stand as required for full-time employment "warrant[ed] reduced credibility" because he at times reached contrary conclusions about her

---

[6] Judge Schofield later denied both parties' motions for reconsideration and awarded Wallace with 50% of the requested fees. *Id.* ¶¶ 504–05.

physical functional capabilities.  *Wallace I*, 2015 WL 1402221, at *20.  However, Judge

Schofield also found that Reiss's visit to Dr. Gladstein was "at the very least procedurally

unreasonable and consequential."  *Id.*  at *17.  Judge Schofield therefore analyzed Hartford's

initial determination with reduced deference.  *Id.* at 20.  However, she nevertheless found

Hartford's reliance on Dr. Gladstein's report to be reasonable and not arbitrary and capricious.

On remand, Wallace submitted additional evidence regarding her OCD.  Doc. 29 ¶ 517.

Hartford initially denied this claim for benefits based on OCD on April 12, 2016.  *Id.* ¶ 527.

However, on January 18, 2017, after an additional letter from Wallace's attorney challenging the

determination, Hartford approved Wallace for benefits for the period of August 5, 2012 through

August 4, 2014 based on her OCD.  *Id.* ¶¶ 549, 552.

On May 15, 2017, Judge Schofield issued the final order in *Wallace I. See id.* ¶ 554.

Soon thereafter, Wallace filed a notice of appeal to challenge Judge Schofield's denial of the

benefits based on physical disability.  *Id.* ¶ 555.  Following mediation, the parties agreed to

voluntarily remand to Hartford for a review of whether Wallace was entitled to physical

disability benefits on and after August 5, 2014.  *Id.* ¶ 558, HL 1224–25.

### E.      The Summer 2018 Application and Denial

Wallace submitted partial documentation of her physical disability to Hartford on June 9,

2018, and additional documentation and arguments on August 13, 2018.  Doc. 29 ¶¶ 559–60.

The August 13 letter argued that (1) Wallace's fibromyalgia and her symptoms had been

confirmed by objective testing; that (2) Hartford's appeal denial of March 23, 2013 was incorrect

and ignored medical documentation; and that (3) Wallace's physicians confirmed that she suffers

from fibromyalgia and chronic fatigue syndrome.  *Id.* ¶ 561.  Among the documentation

submitted were records from several physicians who had examined Wallace since the March 29,

2013 denial.  HL 454–55.  Wallace also asked that all prior documentation from previous claims be considered.  *Id.* 455.

In her application, Wallace drew heavily from a letter dated June 11, 2018 from Dr. Bruce Gillis, a specialist in fibromyalgia, who opined that the "extent, intensity and chronicity of her fibromyalgia-related symptoms . . . demonstrate an unequivocal foundation that Ms. Wallace is no longer a candidate for the open labor market and is therefore permanently and totally disabled."  HL 900–01.  Wallace also argued that Hartford had previously ignored statements in Dr. Meed's APSs that "Ms. Wallace could not sit, stand, or walk any appreciable period of time and was incapable of working at any position."  *Id.* at 902.

Hartford denied this claim on October 31, 2018, stating that "we have concluded that you are not prevented from performing the duties of Any Occupation from a physical perspective from and after 8/5/12."  Doc. 29 ¶¶ 562–63.  The denial letter cited to the report of Dr. Sriram Mummaneni, another consulting physician who had reviewed Wallace's claim.  *Id.* ¶ 564, HL 19.  The letter quoted from Dr. Mummaneni's report, which stated that the "medical records do not identify an objective functional loss, neurological loss, functional loss of [range of movement] of an extremity, or loss of gait or mobility."  *Id.* ¶ 568.  It stated that, in Dr. Mummaneni's opinion, Wallace could sit for "1 hour at a time and 6 hours per day."  *Id.* ¶ 569. Dr. Mummaneni based his opinion on a review of Wallace's medical records and the surveillance footage, but he did not conduct an in-person examination.

Dr. Mummaneni's recommendations regarding Wallace's occupational capacity also provided the basis for Hartford's employability analysis, which was included in Hartford's determination.  HL 830.  The employability analysis was signed by a Vocational Case Manager, Christian B. Camfield, and references the "functional capabilities" identified by Dr.

Mummaneni. *Id.* at 830–32 (noting Dr. Mummaneni's findings regarding Wallace's ability to sit, stand and perform other activities). Camfield states that, based on a computerized job matching system, he had identified various potential occupations that matched Wallace's "current functional capabilities, education, training and work history." *Id.* at 830–32. Hartford relied on this report to conclude that there were several occupations that Wallace was capable of working, and thus she was "not prevented from performing the duties of Any Occupation from a physical perspective from and after 8/5/12." *Id.* at 20.[7]

### F. Appeal of the 2018 Denial

Wallace appealed this denial on April 24, 2019. Doc. 29 ¶ 574. Her letter contended that (1) Dr. Gillis' report clearly demonstrated Ms. Wallace's condition and disability; (2) the medical records supported Wallace's condition and disability; (3) Hartford's denial and Dr. Mummaneni's report were incorrect, and the denial was arbitrary and capricious; (4) Hartford's and Dr. Mummaneni's assessments of Wallace's functional capabilities were without merit; and (5) the videotape surveillance did not support Hartford's denial. *Id.* ¶ 577.

In the appeal, Wallace included an additional report from Dr. Gillis, dated April 1, 2019. *Id.* ¶ 579. Dr. Gillis had conducted a physical examination of Wallace on February 28, 2019, and found that, upon his examination, she was "incapable of tolerating sitting or standing for even 15 minutes at a time." *Id.* ¶ 587. Dr. Gillis also critiqued Dr. Mummaneni's opinion, stating that Mummaneni had "totally ignored" evidence that "[Wallace's] fibromyalgia eliminated any ability for her to participate in such activities in such a workplace environment." *Id.* ¶ 585, HL

---

[7] While Wallace was seeking benefits on and after August 5, 2014, not 2012, Hartford analyzed whether she was physically disabled under the terms of the plan beginning August 5, 2012. It did this because Wallace received disability benefits for the 2012–2014 period based on mental health diagnoses, which are analyzed separately from physical disabilities under the Plan. Therefore, Hartford stated, "even a temporary period of physical disability [between August 5, 2012 and 2014] would extend the benefits beyond the current 08/04/2014 payment through date." HL 5.

691.  Dr. Gillis also stated that Dr. Mummaneni's reference to the surveillance footage to support his conclusion that Wallace could engage in sedentary work was "inane and unsubstantiated." Doc. 29 ¶ 589,  HL 690.  The appeal letter also argued that Dr. Mummaneni's conclusion was incompatible with Dr. Gillis' first report, which cited symptoms such as "chronic fatigue, diffuse body tenderness, generalized weakness, concentration difficulty, mental/brain fog, headaches, joint aches, leg cramps, restless legs, anxiety, depression and diffuse numbness."  Doc. 29 ¶ 606.

On May 22, 2019, Hartford denied Wallace's claim on appeal, stating that benefits were not payable on or beyond August 5, 2014.  *Id.* ¶ 620.  The letter stated that another doctor, Paramvir Sidhu, had reviewed the application.  *Id.* ¶ 621.  According to the letter, Dr. Sidhu acknowledged that the medical records showed that Wallace has fibromyalgia.  *Id.* ¶ 623. However, Dr. Sidhu stated that "none of the providers have mentioned what specific tasks Ms. Wallace is unable to perform and what causes this impairment" and that none of them had "described joint deformities . . . or described how fibromyalgia impairs Ms. Wallace occupationally."  *Id.* ¶¶ 624, 626.   The letter stated that Dr. Sidhu acknowledged Dr. Meed's notes that Wallace could not "sit, stand, walk, lift, or reach," but that Dr. Meed "did not provided [sic] any rationale" for recommending his work restrictions.  *Id.* ¶ 628.  Dr. Sidhu also cited the surveillance footage to opine that Wallace was able to "ambulate, bend, lift, and perform activities requiring fine manipulation and firm grasping."  *Id.* ¶ 630.  Dr. Sidhu listed Dr. Gillis' letters among the documents he reviewed in preparation of the report, but did not specifically respond to the points raised in these letters.  HL 392–96.  Hartford's denial letter also referenced the previous reports of Dr. Gillis, Dr. Mummaneni, Dr. Ash, and Dr. Gladstein, as well as prior APSs by Dr. Meed and records from numerous other treating physicians.  *Id.* at 5, 8–9.

### G.    The Instant Case

Wallace filed this case on November 14, 2019, alleging that both the October 31, 2018 and May 22, 2019 benefit denials were unlawful under ERISA.  Doc. 4.  The parties cross-moved for summary judgment on June 24, 2020.  Docs. 26, 27.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

To prevail on summary judgment, the movant must show that the admissible evidence and pleadings leave "no genuine dispute as to any material fact."  Fed. R. Civ. P. ("FRCP") 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that might 'affect the outcome of the suit under the governing law.'"  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322–23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya*, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). "When, as in this case, both sides move for summary judgment, the district court is 'required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party.'" *Asberry v. Hartford Life & Acc. Ins. Co.*, No. 14 Civ. 69 (JMF), 2015 WL 857883, at *3 (S.D.N.Y. Feb. 27, 2015) (quoting *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## B.    ERISA

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); see also 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . to recover benefits due to [the plaintiff] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.").  "Summary judgment is the typical procedural vehicle by which courts review a challenge to the denial of benefits under ERISA."  *Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 332–33 (S.D.N.Y. 2014) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)).  The plaintiff "has the burden of proving by a preponderance of the evidence that he is totally disabled within the meaning of the plan."  *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006) (internal quotation marks omitted).  The "question of whether or not a claimant is disabled must be judged according to the terms of the [p]olicy."  *VanWright v. First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010).

"In reviewing a denial of benefits challenged under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), a court must apply a *de novo* standard 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case the court must apply an abuse of discretion standard."  *Asberry*, 2015 WL 857883, at *4 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *accord Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009).  In the context of an ERISA plan that grants discretion to the plan administrator, this more deferential standard of review is referred to interchangeably as either an "abuse of discretion" standard or an "arbitrary and capricious" standard.  *See, e.g.*, *Kruk v. Metro. Life Ins. Co.*, No. 07

Civ. 1533 (CSH), 2009 WL 1481543, at *2 n.1 (D. Conn. May 26, 2009) ("The term 'arbitrary and capricious' is used interchangeably with the phrase 'abuse of discretion,' and either describes the deferential standard applied when an ERISA plan reserves discretion.").

A decision is arbitrary and capricious only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) (citation omitted). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation marks omitted). In other words, "[Hartford's] decision must be upheld unless it is not grounded on any reasonable basis." *Wedge*, 23 F. Supp. 3d at 334. (citation and internal quotation marks omitted). "[I]n cases where the evidence conflicts, an administrator's conclusion drawn from that evidence that a claim should be denied will be upheld unless the evidence points so decidedly in the claimant's favor that it would be unreasonable to deny the claim on the basis of the evidence cited by the administrator." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015). The Court is "not free to substitute [its] own judgment for that of [the insurer] as if [it] were considering the issue of eligibility anew." *Hobson*, 574 F.3d at 83–84 (internal quotation marks omitted).

Finally, "in reviewing a claim for benefits under ERISA, 'a district court's review under the arbitrary and capricious standard is limited to the administrative record.'" *DeCesare v. Aetna Life Ins. Co.*, 95 F. Supp. 3d 458, 481 (S.D.N.Y. 2015) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995)).

## III.   DISCUSSION

### A.   The Applicable Standard of Review

Wallace argues that the Court should review Hartford's decision-making with reduced deference because Hartford operates under "a structural conflict of interest, and because its decision-making clearly evidences bias and procedural irregularities." Doc. 27-3, Pl.'s. Motion for Summary Judgment, at 7. It is true that, when an insurer "both evaluates claims for benefits and pays benefits claims," then "for ERISA purposes a conflict exists." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 114 (2008). However, when the insurer "has taken active steps to reduce potential bias and to promote accuracy" such as "walling off claims administrators from those interested in firm finances," then any conflict of interest should be given little weight. *Id.* at 117.

Here, while Wallace has made allegations of a structural conflict of interest, she has not affirmatively proffered an argument about what Hartford's decision-making structure is, or how it might present a conflict. Moreover, in *Wallace I*, Judge Schofield found that Hartford demonstrated that it had enacted sufficient procedural safeguards to prevent against bias from structural conflict. *Wallace I*, 2015 WL 1402221, at *17. Thus, the Court will not apply reduced deference based on any structural conflict of interest.

Wallace also argues that certain alleged deficiencies in Hartford's decisions themselves constitute evidence of a conflict of interest. For example, she argues that Hartford and its consultants did not sufficiently comment on Dr. Gillis' reports, that Hartford did not sufficiently consider her subjective reports of pain and extreme fatigue, and that Hartford did not put forth sufficient evidence to counteract the evidence she has submitted. Doc. 27-3 at 8–9. However, these arguments merely describe reasons why she believes Hartford's decision was arbitrary and

capricious.  They do not constitute a procedural unreasonableness separate and apart from

Wallace's disagreement with Hartford's determinations and their reasoning.[8]  *Cf. Glenn*, 554

U.S. at 118 (2008) (noting instances of "procedural unreasonableness" such as a plan

administrator's adoption of internally inconsistent positions and its failure to provide consulting

physicians with all relevant evidence).

Here, the Plan states that "[w]e have full discretion and authority to determine eligibility

for benefits and to construe and interpret all terms and provisions."  POL 19.  Thus, the arbitrary

and capricious standard applies.  *See Asberry*, 2015 WL 857883, at *4.

### B.    Background Regarding Analysis of Fibromyalgia Claims under ERISA

Fibromyalgia and chronic fatigue disorder have often presented challenges for courts in

the ERISA context because they do not lend themselves easily to objective evidence, and are

defined largely by subjective symptoms of pain and fatigue.  *See Magee v. Metro. Life Ins. Co.*,

632 F. Supp. 2d 308, 318 (S.D.N.Y. 2009).[9]  Even in cases such as this, where there is no dispute

as to the underlying *existence* of the plaintiff's diagnosis, it can be difficult to assess the extent to

which the condition interferes with daily functioning.  The relevance of certain symptoms might

also depend on a particular benefits plan's definition of "disability," as well.

However, certain principles are established.  The "subjective element of pain is an

important factor to be considered in determining disability."  *Mimms v. Heckler*, 750 F.2d 180,

---

[8] The Court is mindful, however, that in *Wallace I*, Judge Schofield reviewed Dr. Gladstein's report with reduced deference because of the procedural irregularity of his conversation with Reiss, Hartford's investigator.  *Wallace I*, 2015 WL 1402221, at *17–18.  Where appropriate, the Court will do the same here.

[9] However, the record suggests there have been recent scientific developments in identifying the biological markers of fibromyalgia.  For example, the letter from Dr. Gillis dated June 11, 2018 notes that the disorder's "substantiation is based upon analyses of the functioning of peripheral blood mononuclear cells," which, in fibromyalgia patients, lack normal protein production.  *See* HL 694.  Dr. Gillis notes that Wallace took a fibromyalgia test that confirmed her diagnosis on this basis.  *Id.*  However, as discussed *infra*, the question in this case is not whether Wallace suffers from fibromyalgia, which is undisputed, but the extent to which this condition has precluded her from working any occupation as of August 5, 2014, according to the terms of the Plan.

185 (2d Cir. 1984).  Thus, a plan administrator cannot discount evidence merely because it is subjective.  *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136–37 (2d Cir. 2001).  However, "[a] distinction exists . . . between the amount of fatigue or pain an individual experiences, which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured."  *See Magee*, 632 F. Supp. 3d at 318 (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323 (7th Cir. 2007)).  Therefore, while a plan administrator may not discount evidence solely on the basis that it is subjective, it may nevertheless request that a claimant submit "some objective measure of [their] capacity to work, so long as that measure is appropriate as applied to each specific condition."  *See Cook v. New York Times Co. Long-Term Disability Plan*, No. 02 Civ. 9154 (GEL), 2004 WL 203111, at *4 (S.D.N.Y. Jan. 30, 2004).

Here, the Plan required Wallace to provide evidence showing that she was "prevented from performing one or more of the Essential Duties of . . . Any Occupation."  Doc. 29 at ¶ 12.  As relevant here, these "essential duties" included the ability to work an occupation's required hours.  *Id.* ¶ 13.  Thus, applying the standards discussed above, the issue before Hartford was not whether Wallace suffered from fibromyalgia and chronic fatigue disorder on or after August 5, 2014, or even whether she subjectively experienced fatigue and pain stemming from these conditions.  Rather, the issue was whether, as of August 5, 2014, the impact of Wallace's physical conditions "limit[ed] [her] functional capabilities" to such a degree that she could no longer perform the essential duties of "Any Occupation" as defined in the Plan.  *See Magee*, 632 F. Supp. 3d at 318; Doc. 29 at ¶ 12.  In making this determination, Hartford was required to consider her reports of subjective symptoms, but was also permitted to require objective proof of her functional limitations stemming from such symptoms.

Wallace argues that both Hartford's initial benefits determination dated October 31, 2018 and its later denial of her appeal dated May 22, 2019 were arbitrary and capricious.  The Court addresses the initial benefits determination first.

### C.    Hartford's Initial Benefits Determination Was Not Arbitrary and Capricious

Wallace claims that Hartford's first denial was arbitrary and capricious because Hartford, and its consulting doctor Sriram Mummaneni, "ignored the medical records and formed an opinion opposing the records without any other evidence to support the decision."  Doc. 27-3 at 13.  However, Hartford's denial letter summarized Dr. Gillis' letter in detail, including its recitation of Wallace's symptoms and his opinion that she was "no longer a candidate for the open labor market."  HL 19.  The letter also, however, summarized Dr. Mummaneni's report and recommendations for Wallace's activities.  *Id.* at 19–20.  These included limitations of one hour of standing or walking at a time, for a total of three hours per day, and sitting for up to one hour at a time for a total of six hours per day.  *Id.* at 20.  Hartford ultimately based its employability analysis on Dr. Mummaneni's findings.  To the extent Wallace argues that Hartford's decision to do so constitutes "ignoring" evidence, the argument is unpersuasive.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (noting that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

Wallace also directly attacks Dr. Mummaneni's report.  However, the Court does not agree with her categorical statement that Dr. Mummaneni "ignored the medical records."  Rather, Dr. Mummaneni's report states that he reviewed 120 pages of records, which include reports and medical records from various providers between 2011 and 2018, progress notes and APSs from Dr. Meed, and Dr. Gillis' June 11, 2018 letter.  HL 660.  Based on a review of these

materials and the surveillance footage, Dr. Mummaneni confirmed that he believed Wallace

"mainly present[ed] with symptoms attributed to fibromyalgia/chronic fatigue syndrome."  HL

663.  He also acknowledged her history of "degenerative changes of the lumbar back and some

issues with the coccyx resulting in chronic pain."  *Id.*  However, Dr. Mummaneni stated that "the

records do not identify an objective functional loss resulting from this."  *Id.*  In support of this

statement, he also acknowledged that Wallace had some "elbow issues" that were being managed

in part through injections, but that "there is no condition to totally limit the claimant."  *Id.*  He

stated that the records showed no loss of range of movement or loss of "gait/mobility" to

preclude functioning, although he acknowledged that the "claimant has some [restrictions and

limitations] mostly due to reported pain issues and to alleviate these."  *Id.*  These observations

find support in the medical records, and account for various of Wallace's symptoms.  It is true

that Dr. Mummaneni did not proffer specific reasons as to why he disagreed with Dr. Meed and

Dr. Gillis' recommendations regarding Wallace's functional capabilities.  However, Dr.

Mummaneni's report indicates that he was asked to opine on her functional capabilities based on

"the totality of the evidence," rather than to specifically critique or respond to either of their

recommendations.  *Id.*  Thus, the existence of evidence contrary to Dr. Mummaneni's

conclusions does not support Wallace's contention that he "ignored" the medical records.

Wallace's argument that Dr. Mummaneni's report is "contrary to all the medical

evidence" fails for similar reasons.  *See* Doc. 27-3 at 15.  Dr. Mummaneni's peer review

indicates that among the evidence he reviewed was an "Independent Medical Examination"

dated April 18, 2012.  HL 660.  This refers to Dr. Gladstein's examination, which was credited

by Judge Schofield in *Wallace I*.[10]  Dr. Gladstein acknowledged Wallace's pain and fatigue, but,

---

[10] In *Wallace I*, Judge Schofield found that it was reasonable for Hartford to have relied on Dr. Gladstein's report over Dr. Meed's contrary statements, notwithstanding the procedural irregularity of Reiss's visit to Dr. Gladstein.

like Dr. Mummaneni, stated that he believed Wallace would be able to perform full-time work with certain accommodations.  Doc. 29 ¶¶ 345–47.  Similarly, many of the medical records reviewed by Dr. Mummaneni reflect visits to physicians who were not squarely asked to opine on Wallace's functional work capacities, but rather saw Wallace for more discrete purposes related to her fibromyalgia management.  In several cases, these records include observations that might conceivably support either side's position.  For example, the record includes documents from a visit to Dr. Robert Levin in early 2015, who acknowledged her chronic pain and fatigue.  HL 822.  However, Dr. Levin also stated that her physical exam showed no acute distress and a "normal" range of motion in the areas examined, normal muscle strength, an ability to change positions, and an ability to climb on the exam table.  HL 824.  While such physician's notes would certainly be more probative if accompanied by an opinion about what this meant for Wallace's contemporaneous ability to work full-time, they did not include such opinions.[11]  Thus, the Court can only assess whether Hartford's reliance on Dr. Mummaneni's interpretation of the record constituted an abuse of discretion in light of all available evidence.  Given that a number of the records reviewed—including Dr. Gladstein's report—could support Dr. Mummaneni's report, the Court finds no abuse of discretion.  *Cf. Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 212 (2d Cir. 2015) ("[I]f the administrator has cited 'substantial evidence' in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious.") (citing *Durakovic*, 609 F.3d at 141).

---

2015 WL 1402221, at *20.  The Court agrees that Dr. Gladstein's conclusions were reasonable and consistent with other evidence he reviewed.  *See id.* at *19–20.

[11] However, as described in more detail in Section III.D., *infra*, even later reports finding a full inability to work would not necessarily be dispositive for Wallace, as plan administrators are permitted to place greater weight on evidence closer to the date from which a disability is claimed.  *See Hines v. First Unum Life Ins. Co.*, 14 Civ. 2961 (ER), 2016 WL 1246483, at *14 (S.D.N.Y. Mar. 23, 2016) (collecting cases).

Wallace also argues that because Dr. Mummaneni did not examine Ms. Wallace personally, "any assessment [by Hartford] of Ms. Wallace's functional capabilities could only come from the medical record or from Dr. Gillis' report of June 11." *Id.* This argument first fails because, as of the June 11, 2018 report, Dr. Gillis had not personally examined Ms. Wallace, either. Moreover, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan*, 538 U.S. at 834. Thus, Dr. Mummaneni was under no obligation to defer to Dr. Gillis or Dr. Meed. In any event, a claims administrator "may rely on the opinion of independent medical reviewers who have not conducted an examination of the applicant, even where the reviewer's opinion conflicts with that of the treating physicians." *Zoller v. INA Life Ins. Co. of New York*, No. 06 Civ. 112 (RJS), 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008). Thus, to the extent Wallace argues that Hartford was obligated by law to defer to a specific doctor's evaluation of her functional capacities, this argument is unpersuasive.

Wallace also argues that, even if Dr. Mummaneni's findings are to be credited, they still do not support a conclusion that Wallace is able to work an eight hour day, because Dr. Mummaneni stated only that Wallace was able to sit for "up to 1 hour at a time for a total of 6 hours per day." HL 664. However, the employability analysis conducted by Hartford—which indicates that it was "based on her current functional capabilities"—includes this six-hour limitation in its recitation of her "functional capabilities." HL 830. The Plan also defines full-time employment as 30 hours per week. *See* POL 8. Moreover, Hartford's vocational case manager determined, based on the fact that the employability analysis yielded numerous occupational matches, that Wallace was employable and not prevented from working any occupation. HL 832. Given that the case manager's analysis was based on Dr. Mummaneni's

recommendations, the Court cannot find that these recommendations preclude a finding that Wallace is employable.

Finally, Wallace takes issue with Dr. Mummaneni's reference to the surveillance footage in his decision, arguing that footage of Wallace walking her dog and running errands cannot support a finding that she is able to work a full-time job. Doc. 27-3 at 17. It is true that limited weight must be placed on surveillance footage when that footage does not show activities directly related to a claimant's occupation. *See Chan v. Hartford Life Ins. Co.*, No. 02 Civ. 2943 (LMM), 2004 WL 2002988, at *9 (S.D.N.Y. Sept. 8, 2004). However, as discussed above, Dr. Mummaneni's opinion (and Hartford's denial) properly considered the footage as a piece of evidence that did not correspond to some of her stated symptoms, such as a claimed inability to use her upper and lower extremities.[12] HL 663. It was not arbitrary and capricious for Hartford to rely on Dr. Mummaneni's examination, which considered the surveillance footage, so long as Hartford also considered other clinical information. *See Ingravallo v. Hartford Life and Acc. Ins. Co.*, 563 F.App'x 796, 800 (2d Cir. 2014) (decision was not arbitrary and capricious when claims administrator weighed surveillance footage as part of its assessment, but also weighed other clinical information), *cf. Chan*, 2004 WL 2002988, at *9 (video footage was insufficient in combination with the lack of any independent medical evaluation or an employability analysis).

The Court recognizes that there is considerable evidence in the record, such as Dr. Gillis' letters, that could also support a finding that Wallace is unable to work. However, the task before the Court is not to make a *de novo* assessment, nor is it to speculate about Wallace's present ability to work. Rather, the Court must assess whether Hartford abused its discretion in

---

[12] Similar findings were observed by Dr. Gladstein in his physical examination. *See* ¶ 341, 344. In *Wallace I*, Judge Schofield also found that Dr. Gladstein's consideration of the surveillance footage itself was not improper. 2015 WL 1402221, at *20.

denying Wallace disability benefits as of August 5, 2014.  When a plan administrator is tasked with weighing "disputes among medical experts as to her physical condition," such disputes are "precisely within the discretion of the plan administrator to resolve."  *Kruk v. Metro. Life Ins. Co., Inc.*, 567 F.App'x 17, 19 (2d Cir. 2014).  Thus, the Court cannot find an abuse of discretion here.

### D.     Hartford's Determination on Appeal was Not Arbitrary and Capricious

In her appeal of Hartford's October 31, 2018 benefits denial, Wallace raised many of the same arguments regarding Dr. Mummaneni's report as she has raised to this Court.  Wallace also included another report from Dr. Gillis dated April 1, 2019.  This time, Dr. Gillis included the results from an in-person examination of Wallace conducted on February 28, 2019, in which he confirmed that, over the course of a two hour examination, "[Wallace] was indeed incapable of tolerating sitting or standing for even 15 minutes at a time," and that she suffered from "intractable pain."  Doc. 27-3 at 20–21 (citing HL 689).  Hartford's letter denying her appeal also included a new report from Dr. Paramvir Sidhu, a consulting physician.  Dr. Sidhu's report listed Dr. Gillis' April 1, 2019 letter in its recitation of documents reviewed, but did not directly address its substance.  HL 393.  Dr. Sidhu stated that he believed Wallace could perform all duties of a 40-hour work week.  HL 395.  While he acknowledged that Dr. Meed had recommended work restrictions for Wallace in one of his APSs, he stated that "Dr. Meed has not provided any rationale for recommending these work restrictions."  HL 396.

In its denial of her appeal, Hartford acknowledged that Dr. Gillis' letter stated that Wallace would have been unable to work due to her condition since 2010; however, it determined that the "weight of the evidence" showed that Wallace's condition was not so severe as to prevent her from functioning from August 5, 2012 through August 5, 2014 and beyond.  HL

9.  In support, Hartford cited the reports of Dr. Sidhu, Dr. Mummaneni, Dr. Gladstein and Dr.

Ash, as well as certain findings of other doctors whose records they relied on.  HL at 4–5, 8–9.  It

also stated that, while Wallace had been approved for Social Security Disability benefits, those

determinations are governed by different standards than the Plan.  *Id.* at 6–7.

      Wallace argues that this denial was also arbitrary and capricious.  She focuses on the

argument that Dr. Sidhu's report was not supported by substantial evidence.  Wallace is correct

that Dr. Sidhu's report failed to address Dr. Gillis' report, as well as several key symptoms

described by Wallace.[13]  For example, while Dr. Sidhu stated that Dr. Meed "[had] not provided

any rationale" for recommending work restrictions, a full review of underlying APSs and letters

from Dr. Meed would show that these restrictions were recommended because of Wallace's

reported symptoms of fatigue and pain.  *See, e.g.*, HL 2447.  Moreover, Dr. Sidhu's report

nowhere acknowledges the possibility that fatigue might prevent Wallace from performing

occupational responsibilities.  Rather, Dr. Sidhu appears to rely on the fact that Wallace's

providers did not "describe[] any joint deformities or syntosis," as well as on the surveillance

footage.  *Id.*  However, a lack of joint deformities or syntosis does not necessarily bear on the

question of whether Wallace's pain and fatigue prevented her from working full-time.  Dr.

Sidhu's report therefore appears to have improperly disregarded evidence solely because it was

subjective.  *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013).[14]

---

[13] Unlike Dr. Mummaneni, Dr. Sidhu was specifically asked to comment on any differences between his opinions
and any attending physicians' opinions.  *See* HL 396.

[14] The Court acknowledges that Wallace raised similar concerns with Dr. Mummaneni's report.  Dr. Mummaneni's
report certainly could have included more detail about Wallace's pain and fatigue, but it nevertheless is sufficient
under the arbitrary and capricious standard.  This is because Dr. Mummaneni explicitly acknowledged that Wallace
suffered from subjective pain and fatigue, but stated that, in his opinion, these symptoms did not preclude any
occupational functioning.  *See* HL 663 (referencing symptoms such as diffuse bodily pains, chronic fatigue, and
sleep issues, but stating that the records and surveillance footage did not show that these manifested in significant
losses of range of movement or gait/mobility, while also incorporating restrictions and limitations based on

However, while it perhaps would have been an abuse of discretion for Hartford to deny Wallace's appeal exclusively on the basis of Dr. Sidhu's report, this is not what Hartford's denial letter did.  Rather, Hartford's denial discussed not only Dr. Sidhu's report but also the reports of Dr. Mummaneni, Dr. Gladstein, and Dr. Ash.  In particular, the denial referenced Dr. Gladstein's findings that (1) his April 2012 examination showed some areas of tenderness, but without the typical trigger points of fibromyalgia; (2) her muscle strength was normal; (3) there were no other deformities or inflammation that would limit Wallace's ability to sit, stand or walk, and (4) that based on his personal examination and review of the records and surveillance footage, she could sit for eight hours with hourly breaks to change position.  HL 8.  It also stated that Dr. Ash had come to similar conclusions.  *Id.*  Dr. Ash's report also found that the record supported restrictions and limitations in the form of five-minute breaks every two hours, but that Wallace was not otherwise precluded from working an eight-hour day.  HL 2435.  Dr. Ash also mentioned that, in August 2011, Wallace's orthopedic surgeon Dr. Hubbard recommended that she return to work without restrictions.  HL 2430.

Hartford was within its discretion to credit these medical opinions over Dr. Gillis' report and Dr. Meed's APSs.  As discussed *supra*, it is within the plan administrator's discretion to weigh conflicting medical opinions.  *See Kruk*, 567 F.App'x at 19;  *see also Wallace I*, 2015 WL 1402221, at *19–20 (finding no abuse of discretion in Hartford's earlier benefits denial when it credited Dr. Gladstein's IME over Dr. Meed's conflicting APSs).  Moreover, while Wallace notes that Dr. Mummaneni and Dr. Ash did not personally examine Wallace, this is not a requirement under ERISA.  *See Zoller v. INA Life Ins. Co. of New York*, 2008 WL 3927462, at *13 (S.D.N.Y. Aug. 25, 2008); *see also Fitzpatrick v. Bayer Corp.*, No. 04 Civ. 5134 (RJS),

---

Wallace's symptoms).  This differs from Dr. Sidhu's report, which did not even address the subjective component of Wallace's conditions and made no mention of the need for any restrictions and limitations.

2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008) ("[A]ny suggestion that an administrator's physicians are *required* to conduct an in-person, physical examination of a plaintiff rather than a review of the record in a case such as this is unsupported by law . . . ") (emphasis in original). Nor was Hartford obligated to defer to the opinions of Dr. Gillis or Dr. Meed because they were treating physicians.  *See Black & Decker Disability Plan*, 538 U.S. at 834.[15]

Critically here, Hartford was also within its discretion to put more limited weight on the fact that Dr. Gillis' personal examination of Wallace occurred in 2019, several years after the beginning of the benefits period in question.  Plan administrators are permitted to put greater weight on doctor's evaluations occurring before, or contemporaneous with, the dates most relevant under the plan.  *See Hines v. First Unum Life Ins. Co.*, 14 Civ. 2961 (ER), 2016 WL 1246483, at *14 (S.D.N.Y. Mar. 23, 2016) (it was within a plan administrator's discretion to put more weight on evidence contemporaneous with the plan's elimination period than evidence post-dating that period); *see also Kellner v. First Unum Life Ins. Co.*, 589 F. Supp. 2d 291, 307–08 (S.D.N.Y. 2008) (placing reduced weight on records post-dating the date at which Plaintiff alleged she became disabled); *Graham v. First Reliance Standard Life Ins. Co.*, No. 04 Civ. 9797 (NRB), 2007 WL 2192399, at *4 (S.D.N.Y. July 31, 2007) (same).  In this case, the question was whether Wallace was disabled from any occupation as of August 5, 2014.  Thus, while Dr. Gillis' report that Wallace had difficulty sitting for more than 15 minutes at a time is certainly probative as to her condition at the time of the examination, Hartford was permitted to consider the fact that this examination occurred years after the date her benefits were terminated.

---

[15] Similarly, while Wallace notes that Dr. Gillis is a fibromyalgia expert, courts in this District have found it sufficient in analogous situations to rely on the reports of physicians who are trained in internal or occupational medicine.  *See Fitzpatrick*, 2008 WL 169318, at *14.  Here, Dr. Sidhu was board certified in internal medicine and rheumatology, Dr. Gladstein was board certified in rheumatology, Dr. Ash was board certified in rheumatology, and Dr. Mummaneni was board certified in internal and occupational medicine.  *See* Doc. 29 at ¶¶ 318, 441, 566, 621. The Court finds these qualifications to be more than adequate.

Finally, Wallace argues that Hartford and its consulting doctors ignored her sleep disorder.  Doc. 27-3 at 22–23.  Defendants have responded that Wallace never raised this argument in her administrative appeal.  Doc. 28, Defs' Opposition Br., at 9.  In her reply, Wallace clarified that she was not arguing that her sleep disorder constituted a separate, standalone ground for disability coverage, but rather that, as an effect of her fibromyalgia, Wallace must sleep 10-12 hours per day or else experience extreme fatigue.  Doc. 32, Pls' Reply Brief, at 9.   The Court agrees that this is a more accurate characterization of how Wallace's sleep disorder has been discussed in the record; indeed, in Wallace's administrative appeal, her fatigue is discussed only in the context of recitations of her symptoms.  *See, e.g.*, HL 468 ("Ms. Wallace's physicians identify that she suffers from fibromyalgia and chronic fatigue syndrome and they repeatedly document her pain and fatigue . . .").  Thus, Wallace has not waived her argument that Hartford ignored her sleep issues insofar as they cause her severe fatigue.

However, by the same token, the Court also does not understand Wallace to have argued that her sleep disorder has created functional impairments separate and apart from the fatigue that was discussed in the reports of Dr. Ash, Dr. Gladstein, and Dr. Mummaneni.  Indeed, in her administrative appeal, Wallace has argued that her fatigue impacts her ability to continually sit, stand and otherwise perform the necessary daily functions to hold a sedentary office job.  HL 468–474.  However, these functional capabilities were analyzed by the independent reviewing doctors discussed above.  For example, Dr. Gladstein stated in his report that, while he acknowledged Wallace's self-reported extreme fatigue, after an examination and review of the medical records and surveillance video, he did not find that there were sufficient functional impairments to support the stricter work restrictions recommended by Dr. Meed.  *See* HL 2548–49.  This report was also credited by Dr. Ash, and both of these physicians recommended a

return to work, with intermittent breaks.  *See* HL 2431–32, 2435–36.  To the extent Wallace argues that Hartford was obligated to separately analyze any other impacts of the sleep disorder, no such theory was properly raised at the administrative level.[16]

## IV.    CONCLUSION

For the reasons discussed, Wallace's motion for summary judgment is DENIED and Defendants' motion is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions, docket numbers 26 and 27, and close this case and enter judgment for Defendants.

It is SO ORDERED.

Dated:    March 24, 2021
          New York, New York

_____
                                EDGARDO RAMOS, U.S.D.J.

---

[16] The Court recognizes that Dr. Gillis' first report, which is also cited in her appeal letter, references "difficulty concentrating" and "mental/'brain fog'" as additional symptoms of her fibromyalgia.  HL 694.  However, aside from excerpting this recitation of her symptoms, Wallace has not otherwise argued in her appeal that concentration difficulties should provide a basis for her long-term disability claim, or that they stem from a sleep disorder more specifically.  Thus, the Court does not find Hartford's failure to address these specific symptoms in its appeal denial to be arbitrary and capricious.